IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 1:18-CR-35-LO |
| v. ) | |
| ) | The Honorable Liam O'Grady |
| IZEAH WILLIAMS, ) | |
| ) | Sentencing Hearing: June 15, 2018 |
| Defendant. ) | |

### <u>DEFENDANT'S MEMORANDUM IN AID OF SENTENCING</u>

Mr. Williams takes responsibility for his crime and makes no excuses. By promptly turning himself in when he learned of the arrest warrant, admitting his guilt, assisting the government in its investigation and prosecutions, resolving his case at the earliest possible moment, and by addressing this Court in writing, Mr. Williams has demonstrated genuine contrition and full acceptance of responsibility.[1] In light of his prompt acceptance of responsibility, the many mitigating factors from his background and character, and his minor role in the offense, a sentence of 40 months is appropriate.

**I.    PRESENTENCE   INVESTIGATION   REPORT   AND   GUIDELINE CALCULATIONS.**

Counsel has reviewed the Presentence Report (Doc. 41 ("PSR")) and has made all objections, additions, and corrections by prior correspondence. The PSR calculated Mr. Williams's base offense level at 30 (PSR at ¶ 79), and his Criminal History Category at III. (PSR at ¶ 146). The PSR then applies the three-level downward departure for acceptance of responsibility, resulting in a base offense level of 27, and a sentencing range of 87-108 months.

---

[1] Doc. 41-1 (a copy of Mr. Williams's statement to Probation is also attached as **Exhibit A**); Let. from Izeah Williams to Hon. Liam O'Grady, dated June 5, 2018 (this letter is included in the Appendix as **Exhibit B**).

Mr. Williams agrees with these calculations, but because he qualifies for a three-level intermediate downward departure for a mitigating role, pursuant to U.S.S.G. §3B1.2, his base offense level should be 24. He further submits that the calculation of his criminal history overstates his actual criminal record and likelihood of re-offending, and requests that the Court exercise its discretion to reduce his Criminal History Category to II. Applying these adjustments results in a sentencing range of 57-71 months.

**A.      Adjustment for mitigating role under U.S.S.G. §3B1.2.**

A downward adjustment for minor role is appropriate where a defendant is substantially less culpable than the average participant in a jointly undertaken activity. U.S.S.G. §3B1.2, comment (n.3). Where the defendant's involvement falls between minimal and minor, a three level adjustment is appropriate. U.S.S.G. §3B1.2. In assessing the appropriate level of adjustment, courts may consider several factors including: (a) the degree to which the defendant understood the scope and structure of the conspiracy; (b) the degree to which the defendant participated in planning or organizing the conspiracy; (c) the degree to which the defendant was a decision-maker; (d) the nature and extent of the defendant's participation, including the specific acts he performed and whether he had responsibility and discretion; (d) the degree to which the defendant benefitted from the conspiracy. U.S.S.G. §3B1.2(b), comment (n.3). Based on the totality of the circumstances, Mr. Williams is the least culpable of the participants in this conspiracy, and a three-level adjustment is appropriate. U.S.S.G. §3B1.2, comment (n.4).

As an initial matter, Mr. Williams' participation was limited to providing Carew with addresses in Virginia, picking up a handful of packages and delivering them to Carew in Maryland or Washington, D.C. Unlike codefendants Cobbold, Patterson, Vandiver, Bennett, Demisse, Byrd, and Wright, PSR at ¶¶ 4, 6, 9, 10, 11, 13, 22, and 23; *see id.* at ¶ 23 (referencing three firearms

recovered from Patterson's home), Mr. Williams never owned or carried a weapon, never engaged in violent, threatening, or similar activity likely to cause physical harm, and never collected drug debts. Likewise, unlike many of the codefendants, most of whom he did not know, Mr. Williams did not travel to California to visit marijuana growing operations or to similarly promote the purposes of the conspiracy. *United States v. Patterson,* 1:18-cr-8, Doc. 71, at 1; PSR at ¶¶ 17, 22, 23. Other than transferring a few packages to Carew, Mr. Williams did not package, sell, divide or otherwise "distribute" the contraband, like most of the other participants in the conspiracy. PSR at ¶¶ 22-25, 28, 30.

Most important, Mr. Williams was not a decision-maker, knew very little about the of scope of the enterprise, did not help organize or direct the conspiracy, and was not a trusted coconspirator. *Patterson*, Doc. 69, at 3; PSR at ¶¶ 22-24, 28; *see* U.S.S.G. §3B1.2, comment (n.4) ("the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant."). Unlike several of the other codefendants, who were shown to have handled or obtained substantial proceeds from this operation, Mr. Williams did not gain significant financial benefits from his limited role in this enterprise. Exhibit A, at 1; PSR at ¶¶ 22-23, 25, 28. Finally, unlike Evans, Byrd, Patterson, Wright, Demisse, and Bennett, Mr. Williams he was not one of Carew's independent contractors and/or customers, operating his own drug business. *Patterson*, Doc. 69, at 2; PSR at ¶¶ 22-23, 24, 25, 28-30. Mr. Williams was neither essential nor indispensable, and in every way occupied the bottom rung of this conspiracy.

Because Mr. Williams was aware he was transferring packages of marijuana to Carew and provided limited logistics – i.e., providing addresses and courier service - he does not qualify for a four level adjustment for playing a minimal role. However, because Mr. Williams was plainly

the least culpable of those involved in the conspiracy, was not essential, had the least authority and knowledge, and derived nominal benefits, a three-level intermediate adjustment is appropriate in this case. U.S.S.G. §3B1.2(a); *see, e.g., United States v. Toscano,* 443 Fed. App'x 184, 187-88 (7th Cir. 2010); *United States v. McColley*, 419 F.Supp. 1310, 1313-14 (D.C. Kan. 2006).

### B. Adjustment to Criminal History Category under U.S.S.G. §4A1.3.

"If reliable information indicates that a defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes," a court has discretion to depart downward. U.S.S.G. § 4A1.3(b); *United States v. Moreland*, 437 F.3d, 424, 432 (4th Cir. 2006). Indeed, departures are "encouraged" where the applicable criminal history category fails to accurately reflect a defendant's true criminal history or the likelihood he will commit other crimes. *United States v. Dixon*, 318 F.3d 585, 588 (4th Cir. 2003). The PSR calculation of Mr. Williams's Criminal History Category is technically correct but nonetheless substantially overstates the seriousness of his actual criminal history and the likelihood of he will re-offend. As such, Mr. Williams requests that the Court exercise its discretion to apply a downward departure.

Mr. Williams submits that a Criminal History Category III overstates the seriousness of his criminal history and that he is not likely to reoffend for several reasons. First, although Mr. Williams's has several convictions, none are felonies. Second, his first two convictions, for which one point was assigned for each, (PSR at ¶¶ 94, 95), were counted even though they fell just inside the ten year period. *See, e.g.,* U.S.S.G. § 4A1.3(b), comment (n.3) ("A downward departure from the defendant's criminal history category may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense"). Third, Mr. Williams's prior offenses are all relatively minor. His 2007 conviction for contributing to the

4

delinquency of a minor occurred when Mr. Williams was 20 and the minor was 17, and involved drinking beer with a friend in public. (PSR at ¶¶ 94). His second conviction, in 2009, for concealing merchandise, involved an unsuccessful effort to pilfer a deck of cards and a box of condoms. (PSR at ¶¶ 95). His third offense in 2011, for petit larceny, involved the sale of an apparently abandoned car for salvage. (PSR at ¶¶ 97). Although he received less than $200 for selling property that did not belong to him and served no time, this offense counted for two criminal history points. Last, his conviction for indecent exposure in 2016, (PSR at ¶¶ 103), for which one criminal history point was assigned, arose from being observed changing out of his swim trunks in a car after leaving the beach. Finally, as detailed below, since his arrest by state authorities for this very offense on April 22, 2017, and for which he obtained bond, Mr. Williams withdrew from the conspiracy, has not reoffended, and has turned his life around.[2] He has been a model inmate, earned his GED while incarcerated, and deepened his relationships with his fiancée and his family and friends.

### C. Conclusion.

For all these reasons, and those to be advanced at the sentencing hearing, Mr. Williams respectfully requests that the Court adjust his base offense level to 24, and exercise its discretion to adjust his criminal history from Category III to Category II.

## II. NON-GUIDELINE SENTENCING CONSIDERATIONS.

There is no presumption of reasonableness attached to the guideline range nor a presumption of unreasonableness of a non-guideline range sentence. At the conclusion of considering the guideline range and § 3553(a) factors in relation to the facts of the case, "the court shall impose a sentence sufficient, but not greater than necessary" to comply with the purposes of § 3553(a). Consideration of these factors shows that a sentence of 40 months is appropriate.

---

[2] Ex. A, at 1; Ex. B, at 9-10; Letter from Evette Ford to Hon. Liam O'Grady, dated June 2, 2018, at 1-2 (a copy of this letter is attached as **Exhibit C**).

### A. History and Characteristics of the Defendant.

As set forth in the PSR and the attachments to this memorandum, Mr. Williams has lived a turbulent, challenging life beset by traumatic events, abuse and dysfunction which combined to undermine his development and adaptation. He was born into a home defined by alcoholism, abuse, poverty, and abandonment. At a vulnerable age, Mr. Williams was removed from his home due to neglect and malnutrition, and spent the majority of his childhood being passed around among family members or homeless. He grew up confused about his relationship with is parents and unclear who his father was. Consequently, Mr. Williams was forced to rely on himself at an early age with few resources. Despite these challenges, Mr. Williams developed into a kind, gentle and giving person, who has been loving and generous to his family, friends, and fiancée.

#### 1. Family dysfunction.

Mr. Williams grew up in an environment defined by dysfunction, poverty, alcohol and drug abuse, an absence of emotional support, and lack of structure.[3] He is the third of four children born to Annette Williams, and raised, at least partially, by her and Anthony Barbour. Because paternity was never established, it is unclear whether the four children have three different fathers or four. What is clear is that both parents were routinely unfaithful to each other, lived for long periods apart, and Mr. Williams grew up confused about his place in the family.[4] As a child, Mr. Williams was told his real father was a man named Chuck Robinson, and his mother would take him to visit Mr. Robison and leave him with that man's mother.[5] Later, when Mr. Robinson was murdered,

---

[3] Ex. B, at 1-5; PSR at ¶¶ 119-21.
[4] Ex. B, at 2, ; Letter from Anthony Barbour to Hon. Liam O'Grady, dated June 2, 2018, at 1 (a copy of this letter is attached as **Exhibit D**).
[5] Ex. B, at 2.

6

Mr. Williams was confused and hurt because it was implied that somehow it was his fault he did not know his real father.[6]

Mr. Williams was treated like a servant by his parents who always fought. He was subjected to violence and abuse, observed it in his parents' marriage, and often feared he or someone would be killed when they tore the house apart. According to Mr. Williams:

> When I was home it was always a lot of drinking and drugs and my parents treated me like I was a slave and ordered me around to serve them. They abused me mentally and verbally. My dad (or whoever he is) Anthony Barbour mentally abused me all the time putting me down, calling me a bum, a bastard, and letting me know I wasn't his kid…. The mental abuse followed me all the way through high school, even though I didn't see my parents that often.[7]

Several witnesses describe the parents as always fighting and at least occasionally Barbour would threaten to kill his wife.[8] With the comings and goings of various men in and out of his mother's life, Mr. Williams was exposed to constant instability and porous personal boundaries, including witnessing the sexual abuse of his younger sister by her biological father.[9] These experiences traumatized Mr. Williams and caused him mental problems. They also normalized erratic, self-destructive, and criminal behavior.

When Mr. Williams was about 10 years old, Child Protective Services removed him and his siblings from his mother's care due to neglect and malnourishment, and the family was permanently fractured.[10] At that time of this intervention, the place the family resided was "really run down [and] a mess. There was trash everywhere and the kids were running wild. They weren't

---

[6] *Id.*; PSR at ¶¶ 120, 122. Chuck Robinson was murdered in 2001, and was the first of several people close to Mr. Williams whose life was ended in a brutal tragedy. *See* Josh White, *Fourth Suspect is Charged in Woodbridge Man's Death,* Wash. Post, Nov. 18, 2001 (Robinson, age 39, was murdered by his roommate and three others in a dispute over money while he and his girlfriend were moving his belongings out of his apartment).
[7] Ex. B. at 2.
[8] *Id.*
[9] *Id.* at 1.
[10] *Id.* at 1, 2; Ex. D, at 1; Letter from Tiase Williams to Hon. Liam O'Grady, dated June 1, 2018, at 1 (a copy of this letter is attached as **Exhibit E**).

bathed and no one was watching them [and] the children suffered a lot."[11] Mr. Williams and his siblings had little to eat, the home had no regular electricity, and during the winter the children would attempt to stay warm by a fire or a kerosene lamp, or by huddling together.[12]

After being removed from his mother's care, Mr. Williams resided for several years with a paternal aunt and, for the first time, lived in a safe environment with regular electricity. During these years he rarely saw his parents or his sisters. His mother did a stint in rehabilitation to treat her alcoholism, and his father ran around accumulating a criminal history[13], but neither appear to have been particularly invested in caring for Mr. Williams. Although the new environment was safe, there was an absence of love and affection, and Mr. Williams suffered from benign neglect. There were limited resources or direction to assist him with his burgeoning personal problems, including a diagnose learning disability, and the family fragmented further. Within a few years of the CPS intervention, his older brother and hero, Jermaine Williams, was put out of the house by his aunt. A few years after that, Mr. Williams was likewise ordered to leave, setting off an extended period of homelessness, depression, and academic failure.

### 2. Family history of alcoholism and drug abuse.

Although Mr. Williams' parents clearly suffered from multiple, serious problems, the touchstone of their marriage appears to have been the toxic mix of substance abuse and infidelity. According to Anthony Barbour, Annette Williams drank heavily from the first time the met and, other than her period in rehab, this continued until she died of cirrhosis in 2017. This included the time she was pregnant with Mr. Williams.[14] According to every witness counsel has interviewed,

---

[11] Ex. D, at 1.
[12] Ex. B, at 3, 4.
[13] Ex. D, at 1.
[14] *See* Ex. D, at 1 ("During her pregnancy with each of the last three kids, Annette continued to drink heavily. At that time no one thought anything about a pregnant woman drinking. I had never even heard that alcohol could affect a baby."). The high correlation between fetal exposure to alcohol and multiple disabilities – including attention deficit, hyperactivity disorder, learning impairments, poor judgment, alcohol and drug problems, and problems with the law

Mr. Williams' mother was chronically drunk and several could not recall seeing her sober.[15] When she was intoxicated, she was volatile and explosive, and drunken arguments with her husband would erupt and often result in physical violence.[16] They usually fought over each other's infidelities (imagined or real), and their battles left the family's home in shambles.[17] Mr. Barbour admittedly was a heavy drinker during the marriage, and they both dabbled in harder substances.[18] Whether caused by a genetic predisposition, fetal alcohol exposure, modeling, or some combination of all three, each of the four children developed substance abuse problems of their own.[19] Mr. Williams began drinking and smoking when he was nine years old, and by the time he was in his late teens, had become dependent on drugs. This dependency appears to have been a direct result of his attempts to numb the pain he experienced when his older brother was murdered in 2007[20], and was greatly exacerbated by successive romantic relationships with multiple drug

---

- is now well-established. Raja Mukherjee, *The relationship between ADHD and fetal alcohol spectrum disorders*, ADHD in Practice, vol. 8, no. 1, at 4-7 (2016); Claire D. Coles, et al., *A Comparison of Chidren Affected by Prenatal Alcohol Exposure and Attention Deficit, Hyperactivity Disorder,* Alcoholism: Clinical & Experimental Research, May 30, 2006 (available at: https://onlinelibrary.wiley.com/doi/abs/10.1111/j.1530-0277.1997.tb03743.x); Zimmerberg B, Mickus LA, *Sex differences in corpus callosum: Influence of prenatal alcohol exposure and maternal undernutrition*, Brain Research, 537 (1–2): 115–122 (1990); Abel EL, Jacobson S, Sherwin BT, *In utero alcohol exposure: Functional and structural brain damage*, Neurobehavioral Toxicology and Teratology, 5(3), at 363–366 (1983).

[15] *See, e.g.,* Ex. B, at 1; Ex. D, at 1 (noting his wife was "a full-time alcoholic and really could not take care of the kids."); Ex. E, at 1 ("we were separated from our mother because of her drinking problem"); Letter from Deborah Trotter to Hon. Liam O'Grady, undated, at 1 (noting that Mr. Williams's "mother was a terrible alcoholic") (a copy of this letter is attached as **Exhibit F**); Letter from Shakira Black to Hon. Liam O'Grady, dated May 15, 2018, at 1 ("his mother was an alcoholic and for the entire time I knew her until last summer … I don't think I ever saw her sober.") (a copy of this letter is attached as **Exhibit G**).

[16] Ex. B, at 1, 2; Ex. D, at 1; Ex. F, at 1.

[17] Ex. B, at 3.

[18] Ex. G, at 1 ("Izeah's dad also had a substance abuse problem for years"); Ex. B, at 3.

[19] *Id.* at 6; Ex. E, at 2; Letter from Jamie Davis to Hon. Liam O'Grady, dated May 28, 2018, at 1-2 (a copy of this letter is attached as **Exhibit I**).

[20] George Quinn, Dominique Morris, and Ricardo Haley broke into a home where Jermaine Williams was sleeping on May 7, 2007, and shot him at point blank range in the face and hip. *Virginia Briefing: Man Gets 39 Years in Slaying,* Wash. Post, Dec. 17, 2008. When Jermaine fled, the trio tracked him down, shooting him multiple times on a neighbor's porch. Apparently, the killers were motivated by the expectation of taking a large amount of drugs or money from the house. *News Brief: Manassas,* Richmond Times Dispatch, Nov. 7, 2007. Quinn and Morris were later charged with capital murder. *Id.*

addicts.[21] It also greatly contributed to his involvement in selling illegal substances when it became the only means for supporting his dependency.

### 3. Parental abandonment and lack of guidance.

From all available evidence, it appears Annette Williams and Anthony Barbour were very poorly prepared to care for four children. Through their substance abuse, psychologicial terror, neglect, elective poverty, and lack of resources, Williams and Barbour deprived Mr. Williams of his childhood. Rather than providing him with a loving, safe and appropriate home, they instead modeled violence and addiction. In every way they abandoned their son, failed to provide any meaningful guidance in life, and left him alone to raise himself. Not surprisingly, as a homeless teenager without resources or support, Mr. Williams became dependent on troubled and unsavory influences.

### 4. Learning disability and emotional impairment.

Starting in the second grade, Mr. Williams was assigned to special education classes to address his learning disabilities, including Attention Deficit, Hyperacivity Disorder. Mr. Williams recalls having a difficult time concentrating and sitting still in class, as well as great difficulty learning. The absence of meaningful support from his parents insured his academic failure and compounded the challenges he faced overcoming the poor start in life. Indeed, according to his peers, Mr. Williams had a genuine desire to achieve academically, but his family's instability was the proximate cause of his failure to finish high school.[22]

### 5. Homelessness and early survival.

Because of his parental abandonment, and the lack of a designated guardian, Mr. Williams was initially relegated to depending on extended family members – including some he did not

---

[21] Ex. B, at 8-9; Ex. D, at 2; Ex. I, at 2.
[22] Ex. G, at 1; Ex. B, at 4-5.

know – to survive. First he moved in with a paternal aunt but was abandoned at the first sign of trouble. Then, he lived with his grandmother, who put him out of her house when he came home after working a late shift. What followed was a series of temporary residences where Mr. Williams slept on the couches of friends, girlfriends, and strangers. During this time there were several instances where he was forced to sleep outside in parks, on benches, or to sneak onto his grandmother's deck. As Mr. Williams wrote in his letter to this Court: "Some nights I'm walking till sun comes up or catching a little sleep in a park or at a school playground, baseball field, parked cars. A few nights a week I'd sneak onto my grandma's porch. A couple of times I got snowed on."[23] Eventually, Mr. Williams moved in with his girlfriend, Rotasha Gray, and her mother, and they lived together for nearly a year. This period of relative stability was punctuated by the birth of his first son, and five months later by the brutal killing of his brother Jermaine.

### 6. Brother's murder leads to addiction.

On May 7, 2007, Mr. Williams's precarious existence was obliterated when his older brother was gunned down while asleep on his girlfriend's couch. According to Mr. Williams: "When I lost my brother my whole life changed drastically. I started drinking and drugging heavy. It was the only thing that took my pain away. Over the next few years I used about every drug …. I flopped around from house to house with no place to go."[24] Mr. Williams then-girlfriend, Rotasha Gray recalls that he "was totally devastated" by his brother's death, and "fell into a terrible depression … quit working" and "talked about ending his life."[25] Mr. Williams apparently was so depressed that he could not function, lost his job, and was again thrown out of his marginal

---

[23] Ex. B, at 5.
[24] *Id.* at 6. In addition to his brother and his biological father, Mr. Williams also had a close cousin murdered in 2009, and a kind boss who hired him at Popeye's restaurant murdered in 2008. Ex. F, at 1; Ex. B, at 5-6; Yusef Najafi, *Tragedy in Woodbridge: Young gay man killed in Virginia Robbery*, MetroWeekly, Jan. 30, 2008 On January 22, 2008, Keith Jamar Truesdale, the night manager of Popeyes on Smoketown Road in Woodbridge, was gunned down during a robbery. *Id.* Two of the defendants were later charged with capital murder.
[25] Ex. H, at 2.

residence. In truth, his depression gave way to serious drug addiction that continued for several years and led directly to selling drugs to support his dependence.[26]

### 7. Devoted father and sibling.

Despite a remarkably dysfunctional upbringing, Mr. Williams has been a relatively stable and consistently positive influence in his son's life, and a loving brother to his sisters. Mr. Williams places the highest value on family and has been generous in sharing with his sisters and his son's mother whenever he is able to do so. He has lived a very modest life, even when working and earning an income, in order to help support his family. After learning that his fiancée was pregnant, Mr. Williams was eager to settle down and create his own family, which he did, and continues to do from the jail.

### 8. Work history.

Mr. Williams began working at an early age in order to earn income to support himself and share with his sisters. Although he has had a spotty work history, due largely to his substance abuse problems, he has worked hard to maintain stable employment in a variety of settings including fast food, photography, waste disposal, and as an arborist. In the eight months prior to his arrest on this charge, Mr. Williams worked full-time for Mitchell's Tree Service in Woodbridge, Virginia, earning a modest but stable income.[27]

---

[26] Ex. B, at 6-7.

[27] Undersigned counsel interviewed Peter Reynolds, Mr. Williams's direct supervisor at Mitchell's Tree Service on two occasions. Mr. Reynolds confirmed that Mr. Williams worked for his company off-and-on for several years, and became a regular employee in early to mid-2017. Thereafter, Mr. Williams exhibited a strong work ethic and a desire to learn and advance. Mr. Reynolds observed a change in Mr. Williams during this period and indicated the company would gladly take him back as an employee after he serves time. Mr. Reynolds agreed to provide a letter to the Court for sentencing. On today's date Mr. Reynolds informed counsel the letter was delayed because his wife had experienced complications associated with a herniated disc in her back. When Mr. Reynolds provides his letter counsel will forward it to the Court.

### 9. Consideration of time in state detention.

Following his arrest on state charges for the identical offense conduct in April, 2017, Mr. Williams was incarcerated at the Prince William County Adult Detention Center for approximately one month before making bail. During his time at that facility, Mr. Williams incurred no disciplinary infractions and was a model inmate. Mr. Williams understands that he cannot receive time credit for this time, but asks the Court to consider this time-served in determining the appropriate sentence and departing downward. In addition, Mr. Williams requests the Court consider his behavior while incarcerated as a testament to his good character and the sincerity of his intention to change.

### 10. Change in behavior following original arrest.

Even before his initial arrest, Mr. Williams began making a genuine change in his life. He quit using drugs and began spending regular and positive time with his son. Following his arrest, he distanced himself from the drug trade, began working a stable job, and started a serious romantic relationship with Evette Ford, his fiancée. When Ms. Ford learned she was pregnant last summer, the couple rented an apartment and began creating the foundation for their family. Mr. Williams was elated to have begun this relationship and looked forward to sharing the birth of their child with Ms. Ford. Mr. Williams gave his entire weekly check to his fiancée to contribute to the household. When Mr. Williams learned about the federal warrant, he faced the setback with maturity and resolve. According to the people who know him best, Mr. Williams has experienced a sincere change in his demeanor and outlook and is intent on confronting his personal problems and legal predicament in a responsible way that dramatically lowers the chances he will re-offend.

**11.     Behavior during pretrial detention.**

Since turning himself in on December 7, 2017, Mr. Williams has been a model inmate at the Alexandria Adult Detention Center. He has received no disciplinary write-ups or infractions and has distanced himself from his codefendants. He earned his high school equivalency certificate (GED), on April 24, 2018, after taking a two-month program provided at the jail.[28] He has used this time to deepen his relationship with his fiancée by calling her almost daily and working through some of the challenges presented by his legal trouble. She reports the experience has made their relationship stronger, that he has been apologetic, and has supported her emotionally during her pregnancy. He understands he created his legal trouble and accepts the consequences. Mr. Williams has worked hard to renew his relationships with his family and friends, many of whom regularly visit him, have written letters of support, and observed a significant change in his behavior and maturity.

**12.     Mr. Williams is a good person.**

Mr. Williams makes no excuses for his crime and consistent with a core value of taking responsibility, he has informed his friends and family what he did and they have responded with an outpouring of kind, heart-felt descriptions about his gentle and decent nature. Mr. Williams is a devoted loving person; a gentle, polite, and dutiful uncle; a loving father; and a truly positive influence in many people's lives. While hindsight helps to explain the circumstances that led to this offense, it does not detract from the fact that he is a good person.

**13.     Genuine remorse and contrition.**

Mr. Williams is contrite and has done everything in his power to take responsibility for his offense. He was originally arrested and charged in state court in April, 2017. After he bonded out

---

[28] Mr. Williams's General Education Development certificate is attached as **Exhibit J**.

he distanced himself from Carew, began working full-time, developed a stable romantic relationship with Evette Ford – a loving and stable influence – stopped using drugs, and changed the course of his life. When he learned of a federal warrant, he promptly turned himself in to federal authorities to face the consequences of his actions. After having counsel appointed, Mr. Williams promptly agreed to plead guilty and provide assistance to the United States. Thereafter, he pleaded guilty on February 2, 2018, becoming the first or one of the first coconspirators to do so. He has also assisted in the government's investigation and prosecution of others. From his initial arrest until he turned himself in, Mr. Williams demonstrated his contrition by reforming his life and taking responsibility for his offense.

### B. Nature and Circumstances of the Offense.

The nature and circumstances of Mr. Williams's offense are addressed in the offense conduct portion of the PSR as well as the statement of facts submitted at the time of Mr. Williams's guilty plea. While the PSR and statement of facts present the relevant facts necessary to support Mr. Williams's conviction, they fail to convey the entire story of the underlying offense. For the purposes of punishment, this Court should consider the additional information provided in the previous sections and the statement he provided for the presentence investigation, (Doc. 41-1), not to diminish Mr. Williams's responsibility, but to provide the proper context within which this Court must determine the appropriate sentence.

### C. Seriousness of the Offense, Respect for the Law, and Just Punishment.

Mr. Williams acknowledges he committed a serious offense and must be punished. Mr. Williams is remorseful for the decisions he made and for the potential harm he has caused to the community. As recounted above and throughout this pleading, Mr. Williams's actions, while criminal, are not worthy of the same punishment meted out to many individuals who have engaged

15

in similar conduct. His crime arose from acute economic problems and desperation, and a desire to provide for his family. Sentencing Mr. Williams below the advisory Guideline range is appropriate because it would recognize that his crime was largely situational and not based on greed or a desire to experience an extravagant lifestyle.

      **D.**      **Unwarranted Sentencing Disparities.**

Counsel submits that the most analogous case to consider is *United States v. Tayvon Patterson*, No. 1:18-cr-8, where the defendant pleaded guilty to a two-count criminal information charging him with Conspiracy to Distribute Marijuana and THC, and was sentenced to 30 months imprisonment, and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, for which he received the mandatory minimum sentence of 60 months, to run consecutive. *United States v. Patterson*, No. 1:18-cr-8, Doc. 74, at 2. Although Patterson's sentencing range for the distribution charge was slightly less than Mr. Williams's, based on the amount of marijuana he distributed and his criminal history, he is far more culpable. Patterson was one of Carew's most trusted confidants and possessed significantly more information about the scope of the conspiracy. Although his plea agreement allowed him to admit to receiving only a single shipment of THC edibles – equating to between 100 and 400 pounds of marijuana - he was linked to at least twelve parcels containing marijuana and THC edibles. PSR at ¶ 23; *United States v. Patterson*, No. 1:18-cr-8, Doc. 51, at ¶ 3. Mr. Williams was linked to six. Patterson also helped legitimize the Carew operation by promoting Carew's lines of clothing on social media. *Id.* After Patterson's arrest, police recovered three firearms and four, large, vacuum-sealed bags containing 10 pounds of marijuana from his residence. Most important, in addition to his participation in the Carew conspiracy, Patterson distributed the marijuana after purchasing is from Carew, and traveled to California to visit the marijuana grow operation. *United States v. Patterson*, No. 1:18-cr-8, Doc. 51, at ¶ 2.

By any metric Patterson was more culpable than Mr. Williams in the conspiracy and in the distribution of marijuana and THC edibles. Yet given the differences in amounts for which he was responsible and his higher criminal history category, a sentence of 40 months for Mr. Williams is appropriate and would avoid an unwarranted sentencing disparity.

### III. IMPOSITION OF A FINE.

Although the Court is authorized to impose a fine in this case, pursuant to USSG § 5K1.2, Mr. Williams requests no fine be imposed because, as the PSR correctly notes, he "is unable to pay a fine or costs of incarceration and supervision herein." (PSR at ¶ 144).

### IV. RECOMMENDATION FOR FACILITY DESIGNATION WITHIN BUREAU OF PRISONS.

After a sentence of imprisonment is imposed the BOP begins the process of designating the offender to a facility for service of the sentence (18 U.S.C. § 3621). The BOP retains exclusive discretion to assign prisoners to any of its facilities, but the Court may specifically make recommendations at sentencing that the BOP will indeed consider. 18 U.S.C. § 3621(4)(A) & (B). Because Mr. Williams has a long standing history of substance abuse and addiction, he respectfully requests that the Court recommend a facility as close to Washington, D.C. that provides residential drug treatment for inmates with addictions and a history of substance abuse. Accordingly, Mr. Williams respectfully requests that the Court recommend that he be designated to one of the following institutions: (1) FPC Beckley (WV); (2) FPC Lewisburg (PA); (3) FPC McKean (PA); or (4) FCI, Butner (NC). If the Court declines to make this recommendation, Mr. Williams respectfully requests the Court recommend a placement at FCI Petersburg or FCI Cumberland, which are the two facilities closest to his family, fiancée and children.

### V. COMMUNITY RE-ENTRY AND REHABILITATION.

To maximize Mr. Williams's reintegration and transition back to society upon completion

of his sentence, the Defense requests that the Court include in its order a recommendation that he eventually be transitioned back to the community through a Residential Re-Entry Center for the maximum period allowed under the law; preferably one that makes drug treatment available for its clients. The Second Chance Act (through 18 U.S.C.§ 3621) authorizes the BOP to transfer inmates to community confinement during the last year of their term, provided they have demonstrated need for reintegration services. Mr. Williams, who has a longstanding substance abuse problem, will greatly benefit from the services available in a Residential Re-Entry Center. Such reintegration will be critical to address the issues that led to Mr. Williams's incarceration in the first place, and will be key his successful return to the community and reintegration into his family. Mr. Williams, therefore, respectfully requests the Court to recommend that he be allowed to serve his final year in a community re-entry program in an approved Re-Entry Center.

## VI.    CONCLUSION.

WHEREFORE based on the foregoing reasons and any others that may appear to the Court or that may develop at the sentencing hearing, Mr. Williams respectfully requests that this Honorable Court sentence him to a sentence of 40 months imprisonment.

                                        Respectfully submitted,
                                        Izeah Williams
                                        By Counsel


_____/s/_____
Joseph T. Flood, VSB #71716
Sheldon, Flood & Haywood, PLC
10621 Jones Street, Suite 301-A
Fairfax, VA  22030
(703) 691-8410
(703) 251-0757 (fax)
jflood@sfhdefense.com

## **CERTIFICATE OF SERVICE**

  I HEREBY CERTIFY that on the 8th day of June, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Carina Cuellar
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314-5794
703-299-3800
Carina.Cuellar@usdoj.gov

            _____/s/_____
            Joseph T. Flood, VSB #71716
            Sheldon, Flood & Haywood, PLC
            10621 Jones Street, Suite 301-A
            Fairfax, VA  22030
            (703) 691-8410
            (703) 251-0757 (fax)
            jflood@sfhdefense.com